140 N.J. Super. 135 (1976)
355 A.2d 679
TOMS RIVER AFFILIATES AND LEHIGH CONSTRUCTION COMPANY, A NEW JERSEY CORPORATION, APPELLANTS,
v.
DEPARTMENT OF ENVIRONMENTAL PROTECTION; COMMISSIONER OF ENVIRONMENTAL PROTECTION AND COASTAL AREA REVIEW BOARD, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 13, 1976.
Decided February 19, 1976.
*140 Before Judges LYNCH, LARNER and HORN.
Mr. Herbert A. Chary argued the cause for the appellants (Messrs. Chary and Porcoro, attorneys).
Mrs. Ermine L. Conley, Deputy Attorney General, argued the cause for the respondents (Mr. William F. Hyland, Attorney General, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
Mr. Robert P. Corman, Assistant Deputy Public Advocate, argued the cause for the intervenor  the Public Advocate (Mr. Stanley C. Van Ness, Public Advocate, attorney).
*141 The opinion of the court was delivered by LARNER, J.A.D.
This appeal is focused upon the constitutional validity of the Coastal Area Facility Review Act (CAFRA) adopted in 1973 and the propriety of the denial of a permit thereunder by the State Commissioner of Environmental Protection (Commissioner). N.J.S.A. 13:19-1 et seq.
A brief summary of the provisions of the act is in order in view of the absence of judicial opinions treating with its interpretation or application since its passage.
The Legislature established boundaries for the "coastal area" of the State and declared in its legislative findings that this area constitutes:
* * * [A]n exceptional, unique, irreplaceable and delicately balanced physical, chemical and biologically acting and interacting natural environmental resource called the coastal area, that certain portions of the coastal area are now suffering serious adverse environmental effects resulting from existing facility activity impacts that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, aesthetic and recreational interests of all people of the State; and that, therefore, it is in the interest of the people of the State that all of the coastal area should be dedicated to those kinds of land uses which promote the public health, safety and welfare, protect public and private property, and are reasonably consistent and compatible with the natural laws governing the physical, chemical and biological environment of the coastal area.
It is further declared that the coastal area and the State will suffer continuing and ever-accelerating serious adverse economic, social and aesthetic effects unless the State assists, in accordance with the provisions of this act, in the assessment of impacts, stemming from the future location and kinds of facilities within the coastal area, on the delicately balanced environment of that area.
The Legislature further recognizes the legitimate economic aspirations of the inhabitants of the coastal area and wishes to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy which preserves the most ecologically sensitive and fragile area from inappropriate development and provides adequate environmental safeguards for the construction of any facilities in the coastal area. [N.J.S.A. 13:19-2]
*142 The State Department of Environmental Protection (Department) is designated as the agency to administer the act and is granted authority to adopt rules and regulations to effectuate its purposes.
After the declaration of the purposes of the legislation the act proceeds to list the facilities subject to its provisions, among which are included new housing developments of 25 or more dwelling units. N.J.S.A. 13:19-3. Section 5 requires the issuance of a permit by the Commissioner as a condition precedent to construction of a covered facility; and sections 6 and 7 outline the nature of the permit application and its accompanying environmental impact statement. In sections 10 and 11 the act sets forth criteria which must be met for the issuance of a permit by the Commissioner. Provisions are also made for a public hearing before the Commissioner and appellate review of the decision of the Commissioner by the Coastal Area Review Board (Board).
In addition to the foregoing provisions relating to permit requirements the Legislature mandated in section 16 that within two years after the effective date of the act the Commissioner shall prepare an inventory of the environmental resources of the coastal area and its existing facilities and an estimate of the capability of various sections in the area to "absorb and react to man-made stresses." The Commissioner is also directed within three years to develop "alternate long-term environmental management strategies," and within four years to prepare an overall environmental design for the coastal area. All the noted reports of the Commissioner are to be submitted to the Governor and Legislature within the indicated time frames. N.J.S.A. 13:19-16.
Toms River Affiliates is the owner of a 9.5-acre tract of land fronting on and overlooking Toms River in Dover Township, New Jersey, which is within the coastal area described in the statute. The existing site contains nine single-family homes, with the surrounding neighborhood devoted to low-density and low-lying buildings utilized for housing *143 and offices. Toms River Affiliates entered into a contract to sell the property to Lehigh Construction Company which contemplated its development by construction of a ten-story condominium building containing 220 residential units together with parking and recreational facilites.
Lehigh Construction Company applied to the Commissioner for the statutory permit. After review of the application, supporting documentation, and a public hearing at which Lehigh Construction Company presented evidence in support of the application and interested citizens presented their views in opposition, the Commissioner denied the application in a lengthy opinion dated July 10, 1974. An appeal to the Board resulted in an affirmance by a written decision of January 3, 1975. Lehigh Construction Company and Toms River appeal from that decision.
The initial thrust of appellants' argument is the contention that CAFRA is unconstitutional in that (1) it does not provide adequate standards for its administration prior to the preparation of the studies called for in section 16; (2) the act grants zoning powers to the Commissioner in contravention of the constitutional delegation of such powers to municipalities; (3) the act creates an invalid classification by designating the coastal area delineated therein and omitting other coastal areas; (4) it denies equal protection of the laws; and (5) it constitutes a taking of property without compensation in violation of the 14th Amendment.
We must approach the constitutional argument with the mandate that there is a strong presumption that a statute is constitutional. Male v. Renda Contracting, 64 N.J. 199 (1974), cert. den. 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed.2d 66 (1975); 2A Sutherland, Statutory Interpretation (4 ed. 1973), § 45.11. This presumption is not overcome unless the statute's repugnancy to the Constitution is clear beyond a reasonable doubt. Harvey v. Essex Cty. Bd. of Freeholders, 30 N.J. 381, 388 (1959); Kochman v. Keansburg Bd. of Ed., 124 N.J. Super. 203 (Ch. Div. 1973).

*144 I
It is a tenet of constitutional doctrine that the Legisture may not vest unbridled or arbitrary power in an administrative agency but must furnish reasonably adequate standards to guide the agency. N.J. Const. (1947), Art. III, par. 1; N.J. Bell Tel. Co. v. Communications Workers, etc., 5 N.J. 354, 370 (1950). Nevertheless, it is well established that regulatory legislation often requires general rather than detailed standards. See Ward v. Scott, 11 N.J. 117, 124-125 (1952), for examples of the types of general standards approved in various regulatory statutes. As observed in Ward:
* * * It is true that in lieu of the general standards set forth the Legislature might have sought to anticipate and enumerate with fixed details all of the individual special instances in which variance would be justified. However, experience has indicated the unwisdom of this course, and an acknowledged advantage of the administrative process has been its flexibility in enabling administrators to deal justly with unanticipated as well as an anticipated situations in accordance with general legislative guides. [at 127]
See also, Spiegle v. Beach Haven, 46 N.J. 479, cert. den. 385 U.S. 831, 87 S.Ct. 63, 17 L.Ed.2d 64 (1966); Wilson v. Long Branch, 27 N.J. 360, 378, cert. den. 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958); State v. Owens-Corning Fiberglas Corp., 100 N.J. Super. 366 (App. Div. 1968), aff'd 53 N.J. 248 (1969); Davis, Administrative Law Treatise, § 2.10 (1958).
The legislation at issue sets forth specific criteria which must be met for the issuance of a permit for a proposed facility. N.J.S.A. 13:19-10. Many of these criteria may not be relevant to an application for a housing facility. Nevertheless, the standards outlined therein establish an adequately defined checklist for the guidance of the agency in granting or denying a permit  a checklist which has sufficient flexibility to carry out the purposes of the legislation in light of the rapidly changing conditions and body of scientific knowledge in the area of environmental protection.
*145 Additional standards are delineated in N.J.S.A. 13:19-11 wherein the Commissioner is authorized to deny a permit where he finds that the "proposed facility would violate or tend to violate the purpose and intent of this act as specified in section 2 or if * * * the proposed facility would materially contribute to an already serious and unacceptable level of environmental degradation or resource exhaustion." As already noted, section 2 in turn sets forth the legislative findings relating to the coastal environment.
It should also be noted that the act affords adequate procedural safeguards to insure against unreasonable and unwarranted administrative action. See Motyka v. McCorkle, 58 N.J. 165, 178 (1971). These include provisions for a hearing before the Commissioner and review by the Board. Dissatisfaction with the result of these proceedings permits judicial review by appeal to the Appellate Division of the Superior Court.
The legislation contains standards which are reasonably adequate to meet the constitutional attack raised by appellants.[1]

II
Appellants urge that the statutory delegation of power to the Commissioner to grant or deny a permit for construction of housing facilities is in conflict with (N.J. Const. (1947), Art. IV, § 6, par. 2 which authorizes the Legislature to enact general laws under which municipalities may adopt zoning ordinances. As a corollary, they argue that CAFRA is invalid because it does not provide proper zoning *146 guidelines parallel to those incorporated in the municipal zoning enabling act (N.J.S.A. 40:55-30 et seq).
We reject these contentions as without merit.
The police power of the State was not exhausted by the delegation of zoning power to municipalities wherein they were authorized to adopt zoning ordinances. The State, with its reserve police power, has the unquestioned authority to delegate that power to one or more agencies of government as the Legislature may deem appropriate. See Roselle v. Wright, 21 N.J. 400, 409 (1956). And the mere fact that the State has delegated a part of the zoning power to municipalities does not inhibit it from also delegating such power to another subordinate agency of government. Meadowlands Reg. Dev. Agency v. State, 112 N.J. Super. 89, 122 (Ch. Div. 1970), aff'd 63 N.J. 35 (1973).
Furthermore, there is no unlawful conflict or preemption problem between the permit power granted to the Commissioner and the zoning power of the municipality which governs the project involved herein. To require a developer to comply with local zoning regulations pertaining to land use and also to comply with use regulations designed to protect state environmental resources is not violative of any constitutional mandate. The additional burden cast upon an owner of coastal lands requiring compliance with environmental standards is a valid exercise of state police power.
The absence of zoning guidelines as such in CAFRA does not invalidate the legislation in any respect. The function of CAFRA, as already noted, is to preserve by regulation the coastal resources of the State; the guidelines are incorporated in the legislative standards for the grant or denial of a permit. These standards are manifestly appropriate for the function and purpose of this legislation and need not be couched in the same terms as zoning legislation to withstand legal attack.

*147 III
Appellants also contend that CAFRA is unconstitutional because it singles out a specific area for regulation. This, they assert, makes CAFRA a special law in violation of N.J. Const. (1947), Art. IV, § 7, par. 9, subpar. 13 of the New Jersey Constitution. Moreover, they argue that this unreasonable classification violates the 14th Amendment equal protection clause.
These assertions are without substance.
In view of the presumption of constitutional validity, the limitation of the act to the coastal area and to the portion thereof delineated by the statutory boundaries constitutes a valid exercise of broad discretionary power vested in the Legislature in the absence of a compelling showing to the contrary. The appellants argue this point in the abstract without any factual support for a conclusion that the territorial limitation is arbitrary or illusory. See Meadowlands Reg. Dev. Agency v. State, supra, 112 N.J. Super. at 102.
The unique and irreplaceable nature of the coastal area of this State and its importance to the public health and welfare amply support the reasonableness of special legislative treatment and regulation. Section 2 of the act, containing the legislative findings, fully expresses the undeniable reasons for the legislation and its rational correlation with the coastal area of the State.[2]
Similarly, the mere failure to encompass all of the coastal area within the ambit of the legislation does not render the act invalid. Boundaries of the coastal area demanding regulation cannot be formulated with mathematical *148 perfection. Two Guys from Harrison, Inc. v. Furman, 32 N.J. 199, 228-229 (1960). Appellants presented no evidence below and point to no element on the face of the legislation which demonstrates a basis for the claim of arbitrariness in the classification adopted by the Legislature. Mere difference of opinion as to the wisdom of the classification does not suffice to declare an act of the Legislature invalid.
We conclude that the act is a general one and does not violate the provisions of the New Jersey Constitution. By the same token, the mere fact that the property of appellants is subject to its provisions while property in other areas of the State is not regulated does not establish a 14th Amendment deprivation of equal protection of the laws. So long as the classification is not shown to be arbitrary and all persons within the controlled area are treated alike the legislation is neither a special law (Raymond v. Teaneck Tp., 118 N.J.L. 109, 111 (E. & A. 1936); Mason v. Paterson, 120 N.J. Super. 184 (Law Div. 1972), aff'd 62 N.J. 471 (1973)), nor violative of the 14th Amendment equal protection clause. Trap Rock Industries, Inc. v. Kohl, 63 N.J. 1 (1973), cert. den. 414 U.S. 860, 94 S.Ct. 74, 38 L.Ed.2d 110 (1973); Torres v. Wagner, 121 N.J. Super. 457 (App. Div. 1972).

IV
Appellants finally contend that the denial of the permit represents the taking of property without compensation, in violation of the 14th Amendment. Such a contention is specious. The particular use which the developer prefers may be frustrated. However, the record reveals that there are alternative uses for the development of the property which will conform with the Board's objections to the proposed project. Under such circumstances the restraint involved is not confiscatory and cannot be considered as an unlawful taking, in violation of appellants' constitutional rights. See A M G Associates v. Springfield Tp., 65 N.J. 101 (1974).

*149 V
In addition to the foregoing constitutional arguments appellants urge that the denial of the permit is not warranted by the factual record and represents an arbitrary exercise of the discretion vested in the Commissioner.
This appeal is necessarily limited to a review of the decision of the Board, which is the final agency arbiter under the administrative procedure provided by CAFRA. We therefore do not undertake the task of analyzing the legal validity of the reasons advanced by the Commissioner for denial of the permit. In passing, however, it should be noted that the objectionable features of the Commissioner's findings were resolved by their rejection in the decision of the Board.
The Board's determination is founded upon the thesis that the construction of a high-density apartment building of ten stories would constitute "an abrupt intrusion to existing land use practices and policies in the Toms River region of the coastal area."
This conclusion, consistent with one of the findings of the Commissioner, is asserted with the following caveat:
Planning standards and criteria for the coastal area are necessary to establish the appropriateness for such a use with its accompanying characteristics at this and other locations in the coastal area. Such standards and criteria have not been established. The objection to this facility stems from aesthetic considerations (both local and regional), existing neighborhood character, and housing type and density of the proposed use. To permit such changes to existing conditions in the coastal zone at this time would tend to foreclose alternative development options.
In essence, therefore, the Board has foreclosed for the time being the construction of this ten-story project until the overall plan for development of the coastal area is adopted by the Department with appropriate standards and criteria.[3] *150 It recognized the dilemma it faces by the vacuum created through the absence of interim planning objectives and criteria. Pending the adoption of such overall objectives the Board sought by its determination to maintain the status quo by preventing what appears to be an aesthetic intrusion upon the existing characteristics of the involved coastal area.
Appellants attack such a determination as beyond the statutory power of the agency, asserting that aesthetic considerations are beyond the scope and intent of CAFRA. In addition, they contend that the absence of the adoption of the comprehensive plan for land uses required by section 16 and the failure to provide interim standards renders the moratorium-like determination of the Board arbitrary.
In the context of the pattern of section 10 of the act (N.J.S.A. 13:19-10), a permit can be granted only if there is compliance with all of the criteria set forth in paragraphs (a) to (g). The finding of the Board and the Commissioner as well is focused upon the failure of the applicants to satisfy paragraph (g) which reads:
He [the Commissioner] shall issue a permit only if he finds that the proposed facility:

* * * * * * * *
(g) Would result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing scenic and aesthetic attributes at the site and within the surrounding region.
This statutory prerequisite as well as the legislative findings explicitly authorize and direct the Commissioner to consider existing "aesthetic attributes at the site and within the surrounding region," (N.J.S.A. 13:19-10(g)), and "to encourage the development of compatible land uses." (N.J.S.A. 13:19-2). Aesthetics are affirmatively recognized as an environmental factor in the implementation of the act by the grant or denial of a permit.
With this statutory authorization the Commissioner and the Board concluded that a ten-story high density structure *151 in the midst of the low-lying and low-density buildings in the surrounding area would be an "abrupt intrusion" upon the existing land uses. This conclusion is reasonably supported by the record herein and cannot be overturned on appeal regardless of the difference of opinion which may arise in the area of aesthetics. Such a determination is equivalent to a finding under section 10(g) that the project would result in more than minimal practicable degradation of the aesthetic attributes of the area  a finding which is proper and valid under the statute as a ground for denial of a permit.
Appellants urge that aesthetic considerations are not appropriate as a basis for denial of a permit in connection with a housing facility. They point to section 7(a) of the act (N.J.S.A. 13:19-7a) which provides for the filing of an environmental impact statement with a permit application. The statement requires an inventory of various conditions pertaining to environmental factors on the site and surrounding region. All of this data is a requisite for facilities which can be categorized as industrial in character. In connection with a housing facility, however, the data required is more limited and covers only "water quality, water supply, hygrology, geology, soils and topography."
From this different statutory treatment of the environmental impact statement for housing facilities under the act appellants argue that the Legislature did not intend to authorize the Commissioner to consider aesthetics on an application involving a housing facility. This argument is without merit. The fact that the impact statement for housing requires less information has no relevancy to the criteria to be utilized by the Commissioner in consideration of the permit application. It merely reflects the legislative opinion that much of the data necessary for an industry application is not essential for a housing application.
There is no doubt that the major motivation for the adoption of CAFRA relates to regulation of industry and curtailment of its potentially serious impact upon various facets *152 of our environment. Despite this obvious feature we cannot overlook the express coverage of "new housing developments of 25 or more dwelling units." This policy decision of the Legislature must be recognized and enforced by both the Department and this court; as a consequence all provisions of the statute must be considered so far as they may be applicable to housing development.
There remains for final examination appellants' contention that the absence of interim standards by way of administrative regulations deprives the Commissioner of the power to prevent construction of the project by denial of the permit. This contention projects the issue whether a permit may be denied as a "stop gap" measure pending the adoption of either interim standards and objectives or comprehensive planning under section 16.
The ultimate test of the validity of the administrative action which freezes the applicant's development until it can be considered in the light of the comprehensive plan to be adopted in the near future is whether it is reasonable. With the adoption of a new statute which requires extensive studies and preparation of a comprehensive plan for development of the coastal area involved it is inevitable that implementation will require a considerable period of time. Does this mean that the agency is powerless to prevent the potential frustration of a consistent and comprehensive plan by uncontrolled helter skelter construction in the interim?
Public welfare sought to be advanced by the police power underlying the jurisdiction of the regulatory agency demands the availability of some interim measures to preserve the status quo pending the adoption of a final plan. "Freeze" regulations have thus been approved as reasonable in the analogous area of planning and zoning. Such "stop gap" legislation is a reasonable exercise of power to prevent changes in the character of the area or a community before officialdom has an opportunity to complete a proper study and final plan which will operate on a permanent basis. See Monmouth Lumber Co. v. Ocean Tp., 9 N.J. 64, 71 (1952); *153 Meadowland Reg., etc. v. Hackensack, etc., 119 N.J. Super. 572 (App. Div.), certif. den. 62 N.J. 72 (1972). The language of the court in the latter case dealing with Meadowlands regulation is particularly appropriate:
The scheme envisioned by the Legislature for development of the meadowlands area is a unique one. It contemplates an imaginative and innovative approach to the solution of numerous and difficult problems. The Commission to which that task has been assigned is entitled to reasonable time to study them and to devise methods to resolve them. The nature of the meadowlands area, the vast potential it has in the public interest, the dangers of a too rapid decision and the consequences of a hastily and improperly drawn final plan underscore the necessity for a very careful study of the entire environmental impact of the final plan and possible alternatives thereto. * * * [at 577]
See also State v. Superior Court of Orange Cty., 12 Cal.3d 237, 115 Cal. Rptr. 497, 524 P.2d 1281 (Sup. Ct. 1974).
In the context of CAFRA and its explicit time frames for preparation of the several reports and comprehensive plan (N.J.S.A. 13:19-16) we find that the "freeze" effect of the permit denial herein is reasonable and a valid exercise of the discretionary power vested in the agency.[4]
It should also be remembered that the Board's reason for denial of the permit was not limited to the single proposition that it was necessary as a "stop gap" measure. The permit was also denied because of the failure to comply with the substantive criterion relating to aesthetics contained in the act itself.

VI
The Public Advocate of the State of New Jersey has intervened as a party to this litigation. He interposes an *154 additional issue related to the applicability and consideration of the public trust doctrine in the determination of this case. See Neptune City v. Avon-by-the-Sea, 61 N.J. 296 (1972). He thereby seeks an adjudication that denial of the permit should be sustained because of the failure to provide for public use of the lands contiguous to Toms River.
Although the Public Advocate's brief raises interesting academic questions, we abstain from considering them since they are not properly before us in the context of the appellate issues on review. There is no factual basis in the record relating to the character of the land and whether it is tide-flowed land lying between the high and low water marks so as to qualify as state-owned property and the application of the public trust doctrine. Neptune City, supra, 61 N.J. at 300; Bailey v. Driscoll, 19 N.J. 363 (1955).
In view of the foregoing, the determination of the Board is affirmed.
NOTES
[1] In the many faceted and unstructured presentation of appellants' arguments in two briefs there lurks the contention "parenthetically" that they were deprived of procedural due process because the Commissioner is one of the members of the Board. N.J.S.A. 13:19-13. This contention is specious in the context of administrative law. See Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975); 2 Davis, Administrative Law Treatise, § 1201 et seq. (1958).
[2] Other states which have adopted similar regulatory legislation applicable to coastal areas are: California, Connecticut, Delaware, Georgia, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, New Hampshire, New York, North Carolina, Rhode Island, Virginia, Washington and Wisconsin.
[3] It should be noted that the act specifically provides that "denial of an application shall in no way adversely affect the future submittal of a new application." N.J.S.A. 13:19-15.
[4] In addition, the Board in its opinion directed the Department to establish by June 30, 1975 interim planning criteria for "the general location of facilities by density of population and types of uses" to remain in effect until a comprehensive planning strategy has been developed pursuant to the act. We have been advised that this has not as yet been accomplished.